If it would please the court, my name is Robert Powell, I'm the attorney for the plaintiffs in this case. I'm joined today by Ms. Barnes and the guardian ad litem, Albert Brody. I submit to this court that the only reasonable perspective of the event of MX falling into the pond on her grandparents' ranch and her grandfather spanking her with a switch in a panic and a fear that anyone who has so much as lost sight of their child in a crowd understands is that it was an isolated event. The marks on the backs of her thighs did not remotely rise to the level of a serious bodily injury. Excuse me, counsel. Isn't there record evidence that the events at the pond took place about four days before the school saw the marks on the child, which would indicate that those were fairly severe spanking or whipping that the child had received? No, I would disagree, and I think that the severity and the degree of it is covered by California law, as well as the regulations that govern social work. And it's explained in our brief that PC, Penal Code 243-D4 talks about what is serious bodily injury, and it talks about permanent, you know, disfigurement, things of that nature. This did not remotely rise to serious bodily injury. And the marks on a very light-skinned 8-year-old child, the marks might still be there, but, I mean, that doesn't mean that they were ever serious bodily injury. And let's take into account, it's a spanking because the child fell. It's a very unique set of circumstances. The child fell in a pond. Like I say, if you lost a child in a store, and almost all of us have at some point or another, you know that panic and fear. But this is worse, because this is a child who had already fallen in a pond, and you're worried about her dying, and you spank her, but you miss on a couple of the spanks. Had he not missed on any of these spanks, we wouldn't be here today. And of course, I submit to you, we should not be. You know, Mr. Paul, you know, I think you're going far beyond the issues in this case. You may be absolutely correct in your analysis of, you know, the underlying situation, what caused it, your client's motivation and so forth. But what we have to decide is the social worker confronted with the situation at the school, at the time, on the basis of limited facts. I mean, was that reaction one, either, right, a violation of clearly established law, or two, you know, was it a reasonable reaction to the circumstances such that she and the deputy should be entitled to qualified immunity? I mean, we can't ‑‑ she didn't know all these things you're talking about, right? She, meaning the child social worker. Well, in some she did, in some she didn't. But knowing about these facts is all part of that reasonable investigation requirement of Wallace. No, but she's got to make a ‑‑ she made the decision on the spot at the school, right? And, you know, so if you talk about that kind of action at the school, it seems to me the controlling case is Green v. Camaretta. And how do you distinguish a case from Green? Well, neither I nor the appellees felt that Green v. Cameretta actually applied, being that it was an excessive interrogation type of a case in a Fourth Amendment analysis on a school interrogation. I mean, you'll find it's mentioned once in both briefs and not applied because it didn't seem to us, and I submit did not appear to appellees to apply as well. You mentioned there, Your Honor, something that ‑‑ but it was a seizure. It was a Fourth Amendment seizure. It wasn't a search. It was a seizure. This is a seizure. Why doesn't it apply? Well, it doesn't apply in the context, I believe, of what Judge Tashimi was asking me, which was they had to make a decision right there on the spot. And Green v. Cameretta was, I believe, a two-and-a-half-hour questioning of this child under a very abusive set of circumstances, as I understood Green. So I didn't see it as factually applying to this case. Which means in Green, though, the officers had more time, right? But the case turned on the nature of their interrogation at the school. And it did not have in that case the components of Wallace, which have been clearly established in this circuit since 2000, of requiring people to do a reasonable investigation. I'm still focusing, rightly or wrongly, Your Honor, Tashimi, on your question about they had to make a decision right there on the spot. And I'm telling you, that's not correct. That is not correct. You have to look at what was the severity of this injury we're looking at. Well, some marks on the child's buttock. They knew it happened at a pond after the child fell in. You don't get to this urgency. You don't get to this exigency that prohibits you from getting a warrant unless the nature of the injury is so severe and there's a reason to believe it's going to happen right away. I responded to you, and I respond again. This reasonable investigation aspect of Wallace and the other cases made that have agreed with that, Rogers, is being somewhat thrown under the bus. Do you think it's unreasonable of a social worker who sees marks on the child's buttocks several days after the marks have been inflicted to think that there's danger, physical danger to the child if she returns to the house? Two answers to that. Had she done a reasonable investigation? No. What more reasonable investigation do you have to know than, child, when you hit, your grandfather hit you, these are the marks? What more reasonable investigation beyond that do you need? Beyond speaking to the developmentally delayed eight-year-old at the school, I submit that the California regulations that govern social work have it right, you're supposed to speak to the parents. That's what they're supposed to do. Well, the custodial parents showed up at 3 o'clock. This investigation started at 1.30, so you've got one and a half hours. In the meantime, and they knew that the parents were going to show up. Parents did show up. Children were not seen until the custodial parents had been interrogated. At that point, the grandfather said, yes, I hit her, and I would hit her again under the same circumstances. Now, he may be right, he may be wrong, but on the other hand, the social worker was reasonable in concluding that there was a danger to the child. I submit, John, that the social worker was not reasonable, and also there is a tribal issue. I was not reasonable. We're talking about whether there was reason to apprehend that there was danger to the child. A reason, you may not agree with the reason, but the question was, would a reasonable person objectively looking at this fact think that there was a possibility that the child would be harmed? Not beyond a reasonable doubt, not a probability, not clear and convincing evidence, but a possibility. Next. It would require the additional component of immediacy, Your Honor. It would require the additional component of immediacy, imminency. It would require that. You cannot say that because the child has been spanked. The case law, the very clearly established case law of Wallace, Maid, Rogers, all of them. Rogers was so emphatic about imminent risk, because you can't just divorce imminent risk from serious bodily injury. You can't just say because, and again, this is for sake of argument that I'm agreeing, this amounted to serious bodily injury. You can't just say that because there was serious bodily injury, it is imminent that it's going to occur again. There has been a disregard of the severity. It's mentioned in Camretta, however, of the severity of. I don't believe what you're saying. You cannot. Do you want to go to another point? You're not convincing me on this one. Well, Your Honor, if I understood you. I mean, here you're saying that a social worker who sees contusion marks on a child's legs and buttocks, and the child says, that is my grandfather who whipped me. And the grandfather says, yes, and I'll do it again. And I'm taking the child home now. And you're saying that there's no reasonable basis to think there's imminent threat of injury to the child? I think if you have another point in your argument, you better get to that. But, Your Honor, I have to address what appear to be things not extracted from the record that we have set forth to you. First of all, there was no contusions to the child. It was a mark. Secondly. What do you think causes the mark? Do you think it was paint? No, the switch. And how does the switch cause the mark other than a contusion? A contusion is a blow which causes the surface capillaries to burst and to show dark. That's what the contusion is. Okay, Your Honor, if the contusion is that definition, I still have to submit to you that the law is quite clear that that does not amount to serious bodily injury. And you say that unless the social worker sees serious bodily injury, he can't separate the child from the parent? No. They have to see either have serious bodily injury or an imminent risk, a reasonable suspicion, an imminent risk of serious bodily injury. We do not have. Oh, you say that there's got to be an investigation. If the child says, I'll never go to the pond again, and the only basis of being switched was going to the pond, then there's no imminent risk. It's just happened a couple of times. It probably isn't going to happen at least that afternoon, right? That's absolutely correct, Your Honor. And then you have the father having had an incident at the school earlier that very same day where he lost his temper and yelled at school officials in front of the child, which indicates some volatility. And also you have the grandmother swatting the child with, I believe it was a spatula, according to the children. Doesn't that also add into the equation of the prospect of imminent danger to those children if they are released to the guardians? Swatting with a spatula does not lead to an imminent risk of serious bodily injury. The court, two justices now have talked about this as if the decision to remove was made after having had the discussion with Mr. Barnes. We have given you in the record very clear evidence that that was not the case, that the protective custody was taken immediately after the conversation with the child. You have three minutes and 42 seconds. I'm doing my job and watching it closely, Your Honor. And when you have – there seems to be a lessening across the board in these agencies of the importance of this familial right of association and the damage that is done when they are taken. In Green v. Camreta, one of the first things that they talk about is a study, and I think Justice Beast said he was on that panel, about the damage that is done to these children. And in this case, they are taken. And in this case, we have that. We have a child that is taken and sexually abused. And this was a rash maneuver to have taken it under these circumstances without ever speaking to mother or father. Burke eventually later said, you at least have to do that. But state law required it of them long ago, long ago, under Title 31. All right. Good morning, Your Honors. I'm David Huskey for Appellees, Emily Hill and Rick Haroon. I have three main points that I'm going to try to make. And then if I have time left, I'll try to respond to some of the points that Mr. Powell was making. The first of those points is that the conduct of Hill and Haroon was lawful under Ram v. Rubin, Baker v. Rakansky, and Mabe v. County of San Bernardino. The second point is that Wallace v. Spencer does not compel a finding that their conduct was unlawful. And the third point is to the extent that critical language in Ram and Wallace may be in conflict, the law was not sufficiently clear to guide the conduct of the social worker and the deputy in this particular instance. Counsel, I'll tell you what bothers me about the actions of your officers in this case. It's not the decision to seize the child, I guess the children, and put them in a foster home on the day of the incident. What bothers me is that they're there for four days before they're brought before a neutral magistrate. It was from, I think, April 26th until May 1st. And two of those days are Thursday and Friday. Now, a bank robber in San Francisco who's arrested and taken down to 850 Bryant Street or 450 Golden Gate is given an arraignment in 48 hours. That's the law, and I think that under Gerstein, that's the law which applies in federal courts. Why didn't your people take these children before a neutral magistrate and hold them for four days instead of just 48 hours? Why wasn't there an illegal seizure of these children at least over the weekend? You know, I frankly do not know the answer to that question. It's never been briefed. It's never been brought up on summary judgment. The facts of that issue have not been developed in the case, and I don't believe that was actually part of the pleading. I agree it's an interesting question, but I'm not really sure what the answer is factually. I can say that this particular social worker is not the individual who sets the hearing. I mean, it's court personnel who would go. Court personnel with the county would be the ones who would schedule the hearing. Your people said that it takes them three to six hours to get a warrant. That's correct. They didn't get a warrant after they seized the children and put them in the foster home to continue the seizure. That would be taking the matter before a neutral magistrate. They could have done it in three to six hours, or they could have had an arraignment within 48 hours, but they didn't do either of those. They separated the children from the grandparents over the weekend when it wasn't really necessary. Now tell me why. Well, I believe that they understood that the hearing was going to be scheduled promptly, and I don't know why it was not scheduled within two days, but I think the understanding was that they had reasonable grounds to take the children into protective custody and that the hearing would follow in an appropriate time frame. Why it did not, I don't know for sure, but I don't... Why didn't they get a warrant and take an affidavit to a neutral magistrate and say, these are the facts, we want to keep custody of the children until the hearing on Monday? I believe it because it was understood that... By whom? The social worker who took the child in protective custody, that a hearing would follow within a... They didn't have to take the issue of seizure before a neutral magistrate. Not in the near future. I believe it's a process, that there's supposed to be the hearing... Process is a bureaucratic word. These children were separated from their parents, the custodial parents. There was already reasonable cause to take them into protective custody. As far as the officers were concerned. Yes. Now, why didn't they present that reasonable cause to a neutral magistrate to determine that the seizure should continue until the hearing? I believe that the case law... What case law is that? Ram v. Rubin. And I'll read the exact language that I'm relying on. Serious allegations of abuse that have been investigated and corroborated usually give rise to a reasonable inference of imminent danger sufficient to justify taking children into protective custody if they might again be beaten or molested during the time it would take to get a warrant. I have no problem with the actions that the officers took at 3 o'clock in the afternoon of the day of seizure. But they testified that it takes 3 to 6 hours to get a warrant, right? And they couldn't get a warrant and take the children from school but to the foster home. I understand that. Why didn't they go to a magistrate and get a warrant after that? Because they already had seizure? Well, I believe in this context the case law isn't clear that that was required. Now, that's an answer. I think the cases in the past have pretty much held that once you have the reasonable cause to take into protective custody... ...to the presentation of children to a magistrate within 48 hours. That's correct, Your Honor. And as the investigation continued and various other people were interviewed, isn't it true that the reasonableness of what had happened at the time of the original seizure, it just bolstered that case? That's correct. The very next morning the social worker interviewed Bridget and Jerry Barnes and Abra Barnes, the daughter and mother of the children, and also the father. His name is escaping me right now. But these four people were interviewed, and particularly Abra made allegations against her parents about physical abuse in the past. And I believe the facts also show that Bridget Barnes was tending to support her husband's actions... Yes. ...and indicating that she may have a misunderstanding about the appropriate level of discipline and force for young children and that that may permeate the Barnes household. And I think the additional concern that the child, the 8-year-old MX, had been dressed for school in such a way that it would be reasonable to infer that someone was trying to hide the marks. That's correct. That was a report by Charlotte Corkery, the second-grade teacher. In addition, I think it's significant what MX said to the social worker, Ms. Hill, at the time. She said her grandfather spanked her on that previous Saturday with the object that left the bruising on her legs. She also said that Bridget spanked her with a spatula, which leads to a serious question as to what is a spanking in that household. And she said that she had been bruised in the past by spankings but could not recall by whom. So she didn't specifically say that Bridget had bruised her with spankings, but it certainly led, I think, to reasonable questions about the level of physical discipline using objects that was being imposed in the Barnes household. And as I read it, and correct me if I'm wrong, I think that these children had only been in the custody of their grandparents a very short time. In the legal custody, yes, but I believe they'd actually been raised in the household. I think the guardianship had been a matter of months, I think from February. But my recollection of the facts is, in fact, they had lived there because of the difficulty with the parents all along. Mr. Husky, first of all, you know, Judge Bay may be raised some serious issues, but I'm not sure they're encompassed in this appeal in the sense that they're raised by the appellant. But but beyond that, his questions remind me that any district court. You asked for like to respond to a summary judgment on behalf of the county. Right. And the district and district court declined to grant the county summary judgment. Right. Yes. I'd move later, though. I, in fact, did a notice motion later. That was good. So you moved. And was that motion ran later? It was now without opposition. All right. Then was there were there any any issues raised with respect to the county concerning the matters that Judge Bay raised? No. And in fact, as I said, I've moved to a sponte because it wasn't clear to me from even from the pleadings that that was raised. But it was unclear that was denied. I moved and briefed the the issues that I saw from the pleadings. There was no opposition and it was granted in the face of no opposition. So, as I said, I believe those are very interesting issues, but they're brand new to me. I've never heard of them before in this case. The issues that Judge Bay raised in the very beginning. All right. I don't think there's any conflict under these facts with the holding of Wallace. That was my second point. The in Wallace. First of all, there was no confirmed physical abuse as there was as the language in RAM addressed. There was speculation fairly wild. That was the court. I think positive should not have been believed. It certainly should have been investigated from an insane person who had falsely accused the family before of ritual sacrifice. And there was three days to investigate that. And I believe in the police finally picked up the children. They thought there was an order and there was not one. So the facts are not remotely similar. But even if there's concern, it's better expressed in Wallace about the whether the removal is reasonably necessary. And I would suggest sort of harmonizing RAM and Wallace when there is confirmed physical abuse and the abuser is in contact with the children, that that might satisfy the reasonably necessary criteria under Wallace for removal. As another point of distinction in Wallace, the wife was factually deemed completely blameless. And that cannot be said to be the case here, at least as far as the understanding of the social worker, given what she'd been told by MX and by Miss Corkery. Lastly, I'd like to the Supreme Court for persons of qualified immunity uses the phrase plainly incompetent, that the qualified immunity protects all but those who knowingly violate the law or those who are plainly incompetent. They didn't just say incompetent. Plainly presumably means something here. In other words, it's not just conduct that, well, some people might think it's a mistake. Some people might think it's incompetent. It has to be conduct that no one could think under existing law would be lawful. And I don't believe that the conduct here in question comes close to that standard. I would submit that the plainly incompetent means, by analogy to the criminal law burden of proof, incompetent beyond a reasonable doubt. Here, I mean, there's no real discussion. I mean, there can be no real debate as to whether there is competency. Here, under the case law, I think she followed the case law under Ram and under Mabe, which Mabe is an important case, in that it says that violence is something that can occur spontaneously, randomly at any time and distinguished violence from a pattern of sexual abuse that was occurring in that case at night and that had ceased for 30 days after it had been reported to the police. So in that case, there would be time to get a warrant. I'd expressly note that in cases of violence like we have here, that can happen at any time, and if it can happen at any time, I think that means if the perpetrator has access to the children, it might happen in the time that it would take to get a warrant. What does the record show, picking up on Judge Reed's question, what does the record show as to when the spanking took place with the pond incident and when the social worker observed the marks? Four days. I believe it happened on a Saturday, and I believe that it was a Wednesday. Yeah, and the teacher had noted that the clothes were suspicious the first two days of school. The corkery in her note said that she thought there might have been an effort to cover up the bruises. You mean wearing pants to school, an eight-year-old, is suspicious? According to the teacher, it was her interpretation, and it's in the report to CPS. Her report indicated that she felt that the clothes that the child had worn to school were suspicious. Does that sound like the post-hoc rationalization? It was almost the first information that the social worker got. That was the initial report that led her to the school. As I recall, didn't the school have some kind of uniform? Yes. And in a sense, wearing that extra pair of slacks under the skirt is like out of uniform. It may or may not have been true, but that's the information that the social worker had, and I think that's the point of it. There's a lot of debate in the briefs about, well, that's ridiculous, but that was a second-grade teacher who made the report who indicated that, so I think it was not the most compelling fact, but a fact that would indicate doubt about what was going on in the Barnes family. I'm out of time. Thank you. Thank you, sir. Thank you. I'd like to quickly address some of the things Mr. Husky has said and some of the things that the holdings have said. Rem v. Rubin, where it makes the statement about serious allegations, if corroborated, lead to a reasonable inference that there might be future abuse, quotes Baker v. Rakansky, and you will not find that language in Baker v. Rakansky anywhere. The issue about the clothing, what Mr. Husky said there was, it's the information the social worker had, but that's the problem. If you're going to take allegations from one person or statements from one person and you're not going to investigate it, you can always say, well, that's the information I had. But really, what is the reasonable inference of the clothes the child wore? You don't know who put them on. You don't know why they're wearing them. School policy was to wear those exact kind of things the child was wearing. So how that could lead to a reasonable inference that that was some effort to cover up a mark that the child wasn't concerned about, nobody was concerned about in the family, including Aubra, I think is a misnomer. Mr. Husky talked about plainly incompetent or knowingly violating the law. We've addressed plainly incompetent in our brief. Ms. Hill claims that she knew the law. She knew it was imminent risk of serious bodily injury in her deposition. Then that's a person who knowingly violates the law because you did not have serious bodily injury. You had four days from when this occurred. No injuries in between those four days. This child was not taken to a doctor or a hospital. If it was a serious bodily injury, we would have to do that, would we not? That did not happen. Not taken to a magistrate, as Judge B mentioned. The aspect of Aubra, we tell you in the brief, Aubra tells you in her deposition, that what this department did was tell her, we're going to get your kids back. We don't care that you and your husband have been crackheads and meth heads, abused these children, had them around drug deals for years. We don't care. And so then Aubra pretty much said whatever it is that they wanted to hear because that's how it goes down there. Lastly, Bridget. A spatula. A spanking with a spatula is not child abuse. Not under any scenario. You'll also notice no one was prosecuted criminally for this. There's not even a mention that the police even, even Haroon, who came out, even spoke to Jerry about a criminal charge. His kids were already in protective custody when he spoke to Jerry. That's clear in Ms. Phil's testimony. But there was no criminal charge. There was no crime. This was not a case of an imminent risk of serious bodily injury. Children should not have been removed. There was time to get a warrant if you did want to remove them. Thank you, Your Honors. Thank you very much. The case of Barnes v. County of Placer will be submitted. And that concludes our calendar of hearings for today and for the week. Court stands adjourned.
judges: Reade, Tashima, Bea